Slip Op. 18-162

## UNITED STATES COURT OF INTERNATIONAL TRADE

NEW MEXICO GARLIC GROWERS
COALITION AND EL BOSQUE FARM,

        Plaintiffs,

QINGDAO TIANTAIXING FOOD CO.,
LTD.,

        Consolidated Plaintiff,

    and

SHANDONG JINXIANG ZHENGYANG
IMPORT & EXPORT CO., LTD. AND
JINING ALPHA FOOD CO., LTD.,

        Plaintiff-Intervenors,

    v.

UNITED STATES,

        Defendant,
    and

ZHENGZHOU HARMONI SPICE CO.,
LTD., HARMONI INTERNATIONAL
SPICE, INC., FRESH GARLIC
PRODUCERS ASSOCIATION,
CHRISTOPHER RANCH, L.L.C., THE
GARLIC COMPANY, VALLEY GARLIC,
AND VESSEY AND COMPANY, INC.,

        Defendant-Intervenors.

Before: Mark A. Barnett, Judge
Consol. Court No. 17-00146

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's final results and partial rescission of the 21st administrative review of the antidumping duty order on fresh garlic from the People's Republic of China.]

Dated: November 26, 2018

Robert T. Hume, Hume & Associates LLC, of Taos, NM, argued for Plaintiffs New Mexico Garlic Growers Coalition and El Bosque Farm.

Yingchao Xiao, Lee & Xiao, of San Marino, CA, argued for Consolidated Plaintiff Qingdao Tiantaixing Foods Co., Ltd.

John J. Kenkel, deKieffer & Horgan, PLLC, of Washington, DC, argued for Plaintiff-Intervenors Shandong Jinxiang Zhengyang Import & Export Co., Ltd. and Jining Alpha Food Co., Ltd.  With him on the brief were Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman.

Meen Geu Oh, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States.  With him on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director.  Of counsel on the brief was Emma T. Hunter, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Ned H. Marshak, Grunfeld Desiderio Lebowitz Silverman & Klestadt LLP, of New York, NY, argued for Defendant-Intervenors Zhengzhou Harmoni Spice Co., Ltd. and Harmoni International Spice Inc.  With him on the brief were Bruce M. Mitchell, Alan G. Lebowitz, Jordan C. Kahn, and Jamie L. Maguire.

Michael J. Coursey, Kelley Drye & Warren LLP, of Washington, DC, argued for Defendant-Intervenor Fresh Garlic Producers Association.  With him on the brief were John M. Herrmann and Joshua R. Morey.

Barnett, Judge: In this consolidated action, Plaintiffs New Mexico Garlic Growers Coalition and El Bosque Farms (collectively "NMGGC"), Consolidated Plaintiff, Qingdao Tiantaixing Foods Co., Ltd. ("QTF"), and Plaintiff-Intervenors, Shandong Jinxiang Zhengyang Import & Export Co., Ltd. ("Zhengyang") and Jining Alpha Food Co., Ltd. ("Alpha") (together with Zhengyang, "separate rate respondents"), challenge the U.S. Department of Commerce's ("Commerce" or the "agency") final results and partial rescission of the 21st administrative review ("AR 21") of the antidumping duty order on

fresh garlic from the People's Republic of China ("PRC" or "China").  *See Fresh Garlic*

*from the People's Republic of China*, 82 Fed. Reg. 27,230 (Dep't Commerce June 14,

2017) (final results and partial rescission of the 21st antidumping duty admin. review;

2014-2015) ("*Final Results*"), ECF No. 23-5, and accompanying Issues and Decision

Mem., A-570-831 (June 7, 2017) ("I&D Mem."), ECF No. 23-6.[1]  For the reasons

discussed below, the *Final Results* are sustained.

BACKGROUND

In 1994, Commerce issued an order imposing antidumping duties on fresh garlic

from the PRC.  *See Antidumping Duty Order: Fresh Garlic from the People's Republic*

*of China*, 59 Fed. Reg. 59,209 (Dep't of Commerce Nov. 16, 1994) (*AD Order*).

Commerce calculated a weighted-average duty margin for the PRC-wide entity of

376.67 percent.  *AD Order*, 59 Fed. Reg. at 59,210.

In November 2015, Commerce published a notice informing interested parties of

the opportunity to request an administrative review of the *AD Order* for the period of

review ("POR") November 1, 2014, through October 31, 2015.  *See Antidumping or*

*Countervailing Duty Order, Finding, or Suspended Investigation*; *Opportunity to Req.*

*Admin. Review*, 80 Fed. Reg 67,706, 67,707 (Dep't Commerce Nov. 3, 2015).  In

response, Commerce received requests from multiple entities; three of those entities,

---

[1] The administrative record is divided into a Public Administrative Record ("PR"), ECF No. 23-2, and a Confidential Administrative Record ("CR"), ECF Nos. 23-3, 23-4. Parties submitted joint appendices containing record documents cited in their briefs. *See* Public J.A. ("PJA"), ECF Nos. 82 (Vol. I), 82-1 (Vol. II), 82-2 (Vol. III), 82-3 (Vol. IV); Confidential J.A. ("CJA"), ECF Nos. 83 (Vol. I), 81-1 (Vol. II), 81-2 (Vol. III), 81-3 (Vol. IV).  The court references the confidential versions of the relevant record documents, if applicable, throughout this opinion, unless otherwise specified.

Zhengzhou Harmoni Spice Co., Ltd. ("Harmoni"), Fresh Garlic Producers Association

and its individual members (collectively, "FGPA"),[2] and NMGGC, requested a review of

Harmoni.  *See* Req. for Admin. Review of the Antidumping Duty Order on Fresh Garlic

from the PRC (Nov. 30, 2015), PR 6, CJA Vol. I, PJA Vol. I; Pet'rs' Review Req.; Req.

for Antidumping Review of Zhenghou [sic] Harmoni Spice Co., Ltd. and Affiliates (Nov.

28, 2015) ("NMGGC Review Req."), PR 4, CJA Vol. I, PJA Vol. I; Respondent Selection

Mem. (March 1, 2016) ("Selection Mem.") at 2, CR 15, PR 47, CJA Vol. I, PJA Vol. I

(noting that the agency received requests for review of 44 Chinese exporters).

Commerce initiated AR 21 on January 7, 2016.  *Initiation of Antidumping and

Countervailing Duty Admin. Reviews*, 81 Fed. Reg. 736 (Dep't Commerce Jan. 7, 2016)

("*Initiation Notice*").  Due to the large number of producers and exporters involved,

Commerce selected Harmoni and QTF, the two producers and exporters "with the

largest volume of imports of subject merchandise during the POR," as mandatory

respondents.[3]  Selection Mem. at 4.  After Commerce initiated AR 21 but before it

published its preliminary results, FGPA and Harmoni withdrew their review requests

---

[2] The Fresh Garlic Producers Association and its individual members (Christopher Ranch, L.L.C., The Garlic Company, Valley Garlic, and Vessey and Company, Inc.) are Defendant-Intervenors in this case.  *See* Pet'rs' Reqs. for Admin. Review (Nov. 30, 2015) ("Pet'rs' Review Req.") at 1 n.1, PR 7, CJA Vol. I, PJA Vol. I; Order (July 3, 2017), ECF No. 21 (granting motion to intervene).

[3] Generally, the agency must determine an individual weighted-average dumping margin for each known exporter and producer of the merchandise under review.  19 U.S.C. § 1677f-1(c)(1).   However, if it is not practicable to do so because of the large number of exporters or producers involved, the agency may limit its examination to "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined."  19 U.S.C. § 1677f-1(c)(2)(B).

with respect to Harmoni.  Harmoni Withdrawal of Review Req. (Mar. 4, 2016), PR 49,

CJA Vol. I PJA Vol. I; Pet'rs' Withdrawal of Certain Reqs. for Admin. Review (Mar. 11,

2016), PR 71, CJA Vol. I, PJA Vol. I.

Commerce published its preliminary results on December 9, 2016.  *Fresh Garlic*

*from the People's Republic of China*, 81 Fed. Reg. 89,050 (Dep't Commerce Dec. 9,

2016) (prelim. results and partial rescission of the 21st antidumping duty admin. review;

2014-2015), PR 401, CJA Vol. IV, PJA Vol. IV, and accompanying Decision Mem., A-

570-831 (Dec. 5, 2016) ("Prelim. Mem."), PR 389, CJA Vol. III, PJA Vol. III.  Commerce

preliminarily determined that QTF timely submitted a separate rate certification and

demonstrated its eligibility for a separate rate.  Prelim. Mem. at 2 & n.9 (citation

omitted); *id.* at 13. Commerce found, however, that QTF failed to cooperate to the best

of its ability and significantly impeded the proceeding because it provided false or

incomplete information regarding its affiliations.  *Id.* at 10-11, 17.  The agency used

facts available with an adverse inference (referred to as "adverse facts available" or

"AFA") to find that QTF and four other companies should be collapsed into a single

entity, termed the "QTF-entity."  *Id.* at 17.  Using AFA, Commerce assigned the QTF-

entity a rate of $4.71 per kilogram, which was the highest margin on the record of this

proceeding.[4]  *Id.*

---

[4] At the time of the instant review, the PRC-wide entity rate was $4.71 per kilogram.
Prelim. Mem. at 14 & n. 66 (citing *Fresh Garlic from the People's Republic of China*, 80
Fed. Reg. 34,141, 34,142 (Dep't Commerce June 15, 2015) (final results and partial
rescission of the 19th antidumping duty admin. review; 2012-2013).

Commerce likewise found that Harmoni withheld information requested by the agency, failed to provide information within the established deadlines, and significantly impeded the proceeding. *Id.* at 16. Commerce determined that Harmoni was not eligible for a separate rate, and considered Harmoni part of the PRC-wide entity. *Id.* at 16-17.

Commerce issued its final results in June 2017. *See Final Results*; I&D Mem. Commerce continued to find that QTF provided false or incomplete information regarding its affiliations and failed to act to the best of its ability. I&D Mem. at 31. Commerce found that QTF was affiliated with two additional entities beyond the four addressed in the preliminary results, including Hebei Golden Bird Trading Co., Ltd. ("Golden Bird"). *Id.* Commerce determined that some of the six companies with which QTF was affiliated were part of the PRC-wide entity and, therefore, denied the QTF-entity a separate rate, finding that it was part of the PRC-wide entity and subject to the China-wide rate of $4.71 per kilogram. *Id.* at 30-36, 37. Commerce rescinded the review of Harmoni because it found that NMGGC's review request—the only remaining review request with respect to Harmoni—"was illegitimate *ab initio*."[5] *Id.* at 18.

Before the court, QTF and the separate rate respondents challenge Commerce's decisions to collapse QTF with six other entities, deny it a separate rate, and apply to QTF the PRC-wide rate. *See generally* Consol. Pl. Mem. in Supp. of Rule 56.2 Mot. for J. Upon the Agency R. ("QTF Br."), ECF No. 38; Pl.'s Reply Br. ("QTF Reply"), ECF No. 64; Pl.-Int. Shandong Jinxiang Zhengyang Import & Export Co., Ltd. et al.'s Rule 56.2

---

[5] Further factual background is provided below.

Mot. for J. Upon the Agency R., ECF No. 36, and Mem. of Law in Supp. of Mot. for J.

Upon the Agency R. ("Z&A Br."), ECF No. 36-1.  NMGGC challenges Commerce's

decision to rescind its review of Harmoni.  *See generally* Mot. of Pls. New Mexico Garlic

Growers Coalition and El Bosque Farm for J. on the Agency R. and Revised Mem. in

Supp. of the Mot. of Pls. New Mexico Garlic Growers Coalition and El Bosque Farm for

J. on the Agency R. ("NMGGC Br."), ECF No. 42.  The court heard oral argument on

September 25, 2018.  *See* Docket Entry, ECF No. 86; Oral Arg. Tr., ECF No. 89.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(iii) of the Tariff Act of

1930,[6] as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012), and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence

and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

---

[6] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the United States Code are to the 2012 edition, except that citations to 19 U.S.C. § 1677e are to the 2016 edition, which reflects amendments to § 1677e pursuant to the Trade Preferences Extension Act ("TPEA"), Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015). The TPEA amendments affect all antidumping determinations made on or after August 6, 2015, and, therefore, apply to this proceeding. *See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015*, 80 Fed. Reg. 46,793 (Dep't Commerce Aug. 6, 2015).

DISCUSSION

**I.     QTF's and the Separate Rate Respondents' Motions**

**A.  Relevant Legal Framework**

**1.  Separate Rate Status in Non-Market Economy Proceedings**

In antidumping duty proceedings involving a nonmarket economy country, such as China, "Commerce presumes all respondents are government-controlled and therefore subject to a single country-wide rate." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1353 (Fed. Cir. 2015).  A respondent may rebut that presumption and obtain a "separate" antidumping duty rate by demonstrating the absence of both *de jure* (in law) and *de facto* (in fact) government control over its export activities.  *See id.* at 1353.

An entity wishing to secure a separate rate must submit to the agency a separate rate application or, for an entity who received a separate rate in the most recent segment of the proceeding, a certification that the entity continues to meet the criteria for obtaining a separate rate.  *Initiation Notice*, 81 Fed. Reg. at 737.  Commerce may disregard a respondent's separate rate submission when the agency determines that the information submitted is unreliable.  *See, e.g., Ad Hoc Shrimp,* 802 F.3d at 1355-57*; Jiangsu Changbao Steel Tube Co. Ltd. v. United States*, 36 CIT __, __, 884 F. Supp. 2d 1295, 1309-1310 (2012).  In that circumstance, Commerce continues to rely on the presumption of government control and use the country-wide rate for the named respondent.  *See Jiangsu Changbao Steel Tube*, 884 F. Supp. 2d at 1303.  However, "Commerce's determination that a party is not entitled to a separate rate because its separate rate information is unreliable must be based on substantial evidence." *Fresh*

*Garlic Producers Ass'n v. United States*, 39 CIT __, __, 121 F. Supp. 3d 1313, 1328

(2015) (citation omitted).

### 2.  Collapsing

The antidumping duty statute does not address the consequences of finding that

two or more entities are affiliated when calculating the dumping margin.  *Jinko Solar*

*Co., Ltd. v. United States*, 41 CIT __, __, 229 F. Supp. 3d 1333, 1344 (2017) (citing 19

U.S.C. §§ 1675(a)(2)(A)(ii), 1677b(a)).  Rather, Commerce has promulgated regulations

that treat closely related companies as a single entity (a process referred to as

"collapsing") for purposes of the dumping inquiry.  *See* 19 C.F.R. § 351.401(f).

Specifically, the regulations provide that Commerce

> will treat two or more affiliated producers as a single entity [when] those
> producers have production facilities for similar or identical products that
> would not require substantial retooling of either facility in order to
> restructure manufacturing priorities and the [agency] concludes that there
> is a significant potential for the manipulation of price or production.

*Id.* § 351.401(f)(1).  When assessing whether there is "significant potential for

manipulation," Commerce considers relevant factors including, but not limited to:

> (i) The level of common ownership;
> (ii) The extent to which managerial employees or board members of one
> firm sit on the board of directors of an affiliated firm; and
> (iii) Whether operations are intertwined, such as through the sharing of
> sales information, involvement in production and pricing decisions, the
> sharing of facilities or employees, or significant transactions between the
> affiliated producers.

*Id.* § 351.401(f)(2).

### 3.  Facts Available and Adverse Facts Available

When "necessary information is not available on the record," or an interested

party "withholds information" requested by Commerce," "fails to provide" requested

information by the submission deadlines, "significantly impedes a proceeding," or

provides information that cannot be verified pursuant to 19 U.S.C. § 1677m(i),

Commerce "shall . . . use the facts otherwise available."  19 U.S.C. § 1677e(a).

Additionally, if Commerce determines that the party "has failed to cooperate by not

acting to the best of its ability to comply with a request for information," it "may use an

inference that is adverse to the interests of that party in selecting from among the facts

otherwise available."[7]  *Id.* § 1677e(b).  Commerce uses total adverse facts available

when "none of the reported data is reliable or usable," such as when all of the

"submitted data exhibit[s] pervasive and persistent deficiencies that cut across all

aspects of the data."  *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d

1333, 1348 (Fed. Cir. 2011) (citation omitted).

Commerce employs adverse inferences to "ensure that the party does not obtain

a more favorable result by failing to cooperate than if it had cooperated fully."  Uruguay

Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316,

vol. 1, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199 ("SAA").[8]  Commerce

determines whether a party has acted to the "best of its ability" by assessing whether

that party "has put forth its maximum effort to provide Commerce with full and complete

answers to all inquiries in an investigation."  *Nippon Steel Corp. v. United States*, 337

---

[7] Commerce's authority to use the facts otherwise available is subject to 19 U.S.C.
§ 1677m(d).  *See* 19 U.S.C. § 1677e.  Section 1677m(d) provides the procedures
Commerce must follow when a party files a deficient submission.  *See id.* § 1677m(d).
[8] The SAA "shall be regarded as an authoritative expression by the United States
concerning the interpretation and application of the Uruguay Round Agreements and
this Act in any judicial proceeding in which a question arises concerning such
interpretation or application." 19 U.S.C. § 3512(d).

F.3d 1373, 1382 (Fed. Cir. 2003).  Commerce may apply an adverse inference "under

circumstances in which it is reasonable for Commerce to expect that more forthcoming

responses should have been made."  *Id.*

### B.  Relevant Facts

After QTF submitted a separate rate certification, Commerce issued a

questionnaire to the company.  *See* Prelim. Mem. at 2 & n.9 (citation omitted); Req. for

Information (Mar. 7, 2016) ("Initial QTF Questionnaire"), PR 52, CJA Vol. I, PJA Vol. I.

Section A of the questionnaire requested information regarding QTF's corporate

structure and disclosure of any affiliations with other Chinese garlic entities.  Initial QTF

Questionnaire at A-1—A-2, A-5—A-6.  In response, QTF stated that it "has no

relationship with any other producers or exporters" of fresh garlic from the PRC, and it

"does not share any managers or owners with any other entity."  SAQR in 21st

Antidumping Admin. Review filed on Behalf of QTF (Apr. 1, 2016) ("QTF Initial Sec. A

Resp.") at A-3, CR 48, PR 98, CJA Vol. II, PJA Vol. II.  It also asserted that it "does not

have any affiliated producers of the merchandise under consideration."  *Id.* at A-13.

Following QTF's responses and before the preliminary results, FGPA alleged that

QTF had misreported its affiliations.  *See* Comments on Deficiencies in QTF's Initial

Questionnaire Resps. (May 12, 2016) ("Pet'rs' Deficiency Cmts."), CR 81, PR 175, CJA

Vol. III, PJA Vol. III.  Relying on affidavits of three different individuals claiming personal

knowledge of the allegations, FGPA alleged that an individual named Wenxuan Bai

("Mr. Bai"), and his immediate family members and a business partner named Roupeng

Wang ("Mr. Wang"), own or control a number of Chinese garlic exporters or producers,

including QTF and Golden Bird. [9]  *Id.* at 5-6.  They alleged that Mr. Wang also was the

"founder of Huamei [Consulting] and [Robert] Hume's Chinese co-counsel."[10]  *Id.* at 6

(citation omitted).  FGPA further alleged that QTF shipped fresh garlic to the United

States in packages that identified Golden Bird as the processor.  *Id.* at 8.  Based on

these allegations, FGPA urged the agency to issue a supplemental questionnaire

requiring that QTF address the deficiencies in its Section A responses.  *Id.* at 15.

Commerce issued a supplemental questionnaire to QTF on August 12, 2016,

asking numerous questions related to QTF's possible affiliation with other entities,

including Golden Bird and Mr. Bai.  Second Suppl. Questionnaire to QTF (Aug. 12,

2016) ("QTF 2nd Suppl. Questionnaire"), CR 109, PR 301, CJA Vol. III, PJA Vol. III.

QTF denied any connection to Mr. Bai or Golden Bird and denied having exported any

"fresh garlic that was processed or packaged by Golden Bird."  Resp. to Second Suppl.

Questionnaire (Sept. 6, 2016) ("QTF's Second Suppl. Resp.") at 1, CR 114, PR 325,

CJA Vol. III, PJA Vol. III.  Notwithstanding its assertion that it had no connection to Mr.

---

[9] The other named companies were Qingdao Xintianfeng Food Co., Ltd. ("QXF") and Qingdao Lianghe International Trade Co., Ltd. ("Lianghe").  Pet'rs' Deficiency Cmts. at 5-6.

[10] "Huamei Consulting is a Chinese consulting firm [that was] working with several Chinese garlic exporters, including QTF and Golden Bird."  I&D Mem. at 8.  Huamei Consulting also worked with Hume & Associates LLC ("Hume & Associates"), Robert T. Hume's law firm.  *Id.*  Mr. Hume initially represented QTF in this review, but later withdrew his representation of QTF and represented NMGGC for the remainder of the review.  *See* Entry of Appearance and Appl. for Admin. Protective Order on behalf of QTF (Jan. 12, 2016), PR 23, CJA Vol. I, PJA Vol. I; I&D Mem. at 7; Letter from Hume & Associates LLC to Secretary of Commerce Pertaining to QTF Withdrawal as Councel [sic] to QTF (June 22, 2016), PR 220, ECF No. 23-2.

Bai, QTF acknowledged that Mr. Bai is the brother of QTF's legal representative at that

time, Leiwen Bai.  *Id.*

In its preliminary results, Commerce explained that it had discovered, through

publicly available documents, that QTF was affiliated with four Chinese entities—

Qingdao Tianhefeng Foods Co., Ltd. ("QTHF"), an agricultural processor; Qingdao

Beixing Trading Co., Ltd. ("QBT"), a garlic trading company; QXF, a garlic producer

subject to AR 21; and Lianghe, another garlic producer subject to the review.[11]   Prelim.

Mem. at 10-11.  Commerce found that these companies were affiliated by way of

common control by a single family—the Bai family.  *Id.* at 11.  Based on this information,

Commerce determined that QTF provided false and incomplete information regarding its

affiliations, significantly impeded the proceeding, and failed to cooperate to the best of

its ability; therefore, the agency used adverse facts available to preliminarily determine

that QTF, QXF, QTHF, QBT, and Lianghe "should be collapsed into a single entity," the

QTF-entity.  *Id.* at 17.

In the *Final Results*, Commerce revised its findings and included Golden Bird and

Huamei Consulting in the group of affiliated companies referred to as the QTF-entity.

I&D Mem. at 31.  Moreover, Commerce found that the QTF-entity included companies

that were not eligible for separate rates and, on that basis, determined that the QTF-

entity was part of the PRC-wide entity.  *Id.* at 34-35.  Consequently, based on "total

---

[11] The publicly available documents that Commerce reviewed were reports from China's
State Administration of Industry and Commerce's National Credit Information System
pertaining to the individual entities.  *See* Prelim. Mem. at 10-11 & nn.43, 45-48 (citations
omitted); QTF Affiliation Docs. (Dec. 5, 2016) ("Affiliation Docs."), PR 394, CJA Vol. IV,
PJA Vol. IV.

AFA," the agency continued to collapse the QTF-entity, declined to use any of the other

information QTF reported in its Section A response, and found the QTF entity to be part

of the PRC-wide entity and subject to the China-wide rate.  *Id.* at 32-36.

### C. Parties' Arguments

QTF and the separate rate respondents challenge Commerce's decisions to

apply an adverse inference and to collapse the QTF entity.  *See generally* QTF Br.; QTF

Reply; Z&A Br. at 7-8.  In particular, they argue that QTF's failure to provide the

requested information was due to inadvertence and misunderstanding;[12] Commerce

failed to comply with 19 U.S.C. § 1677m(d) because the agency did not provide QTF

with an opportunity to cure its deficient responses; and Commerce's collapsing

determination failed to comply with 19 C.F.R. 351.401(f) because the agency did not

make a finding, supported by substantial evidence, that there is a "significant potential

for manipulation" by the QTF-entity.  QTF Br. at 7-8, 11-13, 15-21, 23-26; Z&A Br. at 7-

11.  QTF also contends that Commerce's selection of the China-wide rate as an

adverse inference is overly punitive and runs counter to the fundamental principles of

equity and fairness in antidumping duty proceedings.  *See* QTF Br. at 19-20.

The Government and FGPA argue that Commerce's finding that QTF submitted

false and incomplete information is supported by substantial evidence, and the agency's

issuance of the supplemental questionnaire provided QTF an opportunity to correct the

---

[12] Zhengyang and Alpha argue that "QTF fully answered each question," and
Commerce failed to "show that QTF's failure involved anything more than inadvertence."
Z&A Br. at 2, 8.

deficiencies in its initial Section A response.[13]  Confidential Def.'s Opp'n to Pls.', Consol.

Pl.'s and Pl.-Ints.' Rule 56.2 Mots. For J. on the Agency R. ("Gov. Resp.") at 16-21, ECF

No. 60; FGPA's Resp. in Opp'n to Pls.' Mots. For J. on the Agency R. ("FGPA Resp.") at

41-42, ECF No. 49.  The Government and FGPA further contend that Commerce

properly found QTF to be part of the PRC-wide entity.  Gov. Resp. at 25-26; FGPA

Resp. 42-43.  According to the Government, QTF impeded Commerce's ability to

conduct the collapsing analysis because it withheld affiliation information that is integral

to that analysis; therefore, Commerce properly based its collapsing determination on

AFA.  *Id.* at 25.  Likewise, without the affiliation information, QTF's separate rate

information was unreliable and, combined with the finding of affiliation with other

companies not entitled to separate rates, the agency's denial of a separate rate to the

entire QTF-entity was supported by substantial evidence.  *Id.* at 26-28.

### D. Analysis

#### 1. Commerce's Application of Adverse Facts Available is Supported by Substantial Evidence on the Record And is Otherwise in Accordance with Law

Substantial evidence supports Commerce's finding that QTF provided false or

incomplete information regarding its affiliations.  Section A of Commerce's questionnaire

instructed QTF to identify all affiliated companies.  Initial QTF Questionnaire at A-2, A-6.

The Glossary of Terms appended to the questionnaire defined affiliated persons as

including "members of a family," and "an officer or director of an organization and that

organization."  *Id.*, App. I. The Glossary also referenced the statutory and regulatory

---

[13] Harmoni has not presented any arguments concerning issues raised in QTF's and the separate rate respondents' briefs.

provisions for the definition of "affiliated" or "affiliated persons." *Id.*, App. I. (citing 19

U.S.C. § 1677(33); 19 C.F.R. § 351.02(b)).  Both the statutory and regulatory provisions

include members of a family and officers or directors of an organization within the

definition of affiliated persons.  *See* 19 U.S.C. § 1677(33)(A)-(B); 19 C.F.R. § 351.02(b).

QTF responded that it was not affiliated with any other exporters or producers of

fresh garlic from the PRC.  QTF Initial Sec. A Resp. at A-3.  In point of fact, QTF was

affiliated with at least four other entities through family relationships.[14]   I&D Mem. at 31,

33 & n.222 (citation omitted); Prelim. Mem. at 11 & nn.43, 45-48; Affiliation Docs.

Furthermore, QTF does not dispute that it was affiliated with most of those entities or

that it failed to provide information responsive to Commerce's request.  *See* QTF Br. at

18 (acknowledging that the "common denominator" for QTF, QTHF, QBT, and Lianghe

"is the familial relationship through the Bai brothers"); *id.* at 8, 15-16 (arguing that QTF's

failure to provide the information was due to inadvertence, misunderstanding, or

mistake); QTF Reply at 3.  Accordingly, Commerce's finding that QTF failed to comply

with Commerce's request for information is supported by substantial evidence.[15]

---

[14] Commerce described the nature of these affiliations as follows:

> QTF's legal representative and manager, Bai Leiwen, is a [50] percent
> shareholder in [QTHF]. . . . In addition, QTF states that Bai Leiwen is
> brother to Bai Wenxuan[ who], according to publicly-available documents,
> is the legal representative of QXF. . . . Furthermore, QXF's only public
> shareholder is [QBT] . . . and all of its registered capital was provided by
> Bai Wenxuan.  According to publicly-available documents, the brothers'
> father, Bai Xuezhong, is a shareholder in QBT.  Furthermore, the wife of
> Bai Wenxuan, Chen Hongxia, is the manager and legal representative of .
> . . Lianghe.

Prelim. Mem. at 10-11; *see also* Affiliation Docs.

[15] "The focus of [19 U.S.C. § 1677e(a)] is respondent's *failure to provide information.*
The reason for the failure is of no moment."  *Nippon Steel*, 337 F.3d at 1381.

Substantial evidence also supports Commerce's decision to apply an adverse inference.  Commerce may use an adverse inference when the respondent "fail[s] to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1)(A).  Commerce concluded that the QTF-entity failed to cooperate to the best of its ability because the information in question was "standard affiliation information requested of all respondents in [antidumping] proceedings," I&D Mem. at 32, 33 & n.223 (citation omitted), and the "QTF-entity should have been able to provide this information if it had made the appropriate effort" when it received the initial questionnaire, *id.* at 35.  Commerce's factual findings are supported by substantial evidence.

Commerce's questionnaire requested information for all companies affiliated with QTF, and clearly defined the scope of its request.  Initial QTF Questionnaire at A-6, App. I.  QTF asserts that its failure to provide the requested information was inadvertent and based on the assumption that "'control[]' was a requisite component of affiliation." QTF Br. at 16.  QTF did not seek guidance from Commerce, even in light of FGPA's allegations raising concerns regarding QTF's initial Section A responses and Commerce's issuance of a supplemental questionnaire requesting further affiliation information.  QTF, therefore, failed to act to the best of its ability.  *See Reiner Brach GmbH & Co.KG v. United States*, 26 CIT 549, 556-557, 563-64, 206 F. Supp. 2d 1323, 1330-31, 1337-38 (2002) (application of an adverse inference merited when Commerce requested information about "'all' home market sales [] for 'identical or similar

merchandise'" and respondent "never asked Commerce to clarify whether its

assumption was correct," instead, using its own interpretation of the relevant term).

Although QTF admits that its assumption was ultimately erroneous, QTF claims

"inadvertence," "misunderstanding," or "mistake."  QTF Br. at 7, 16; QTF Reply at 3.

QTF's conduct is more appropriately described as an inadequate inquiry into the proper

scope of Commerce's request for information and the company's obligation to respond

accordingly.  QTF is "a sophisticated company with experienced counsel," I&D Mem. at

34, and both the entity and its counsel have a history of prior participation in multiple

segments of this and other proceedings before the agency, *id.* at 32 & n.219 (citing

previous administrative reviews in which QTF and its counsel participated and U.S.

Court of International Trade cases that QTF's counsel litigated).  Thus, QTF could and

should have made further efforts to understand the relevant provisions of the statute

and regulations pertaining to the definition of "affiliated persons" or entities.[16]  *See*

*Nippon Steel*, 337 F. 3d at 1382 (the "best of its ability" standard "assumes that

importers are familiar with the rules and regulations that apply to the import activities

undertaken").[17]

---

[16] QTF asserts, without citation to any record evidence, that it is a "simple and rural company, lacking [in] many [] resources." QTF Br. at 21.  However, that QTF was selected as a mandatory respondent because it was one of the two largest exporters subject to the review undermines QTF's assertion.

[17] The information in question concerned basic affiliation information, "the type that a respondent should reasonably be able to provide."  I&D Mem. at 35.  In fact, "once QTF confirmed that Mr. Bai [] was the brother of QTF's legal representative," Commerce was able to identify QTF's affiliates.  *Id.* at 33.  The availability of the information in public documents further evinces QTF's failure to exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  *Nippon Steel*, 337 F.3d at 1382.

QTF's and the separate rate respondents' arguments that Commerce failed to comply with 19 U.S.C. § 1677m(d) are also unavailing.  As discussed above, following QTF's responses and before the preliminary results, the agency received comments from FGPA regarding QTF's misreporting and issued a supplemental questionnaire. *See* Pet'rs' Deficiency Cmts. at 15; QTF 2nd Suppl. Questionnaire at 3-4.  Although QTF did disclose at that time that its legal representative was Mr. Bai's brother, it nevertheless maintained that QTF itself "has never had any connection to Mr. Bai."[18] QTF 2nd Suppl. Resp. at 1.  Thus, QTF had the opportunity to remedy the deficiencies in its earlier submission, but failed to do so.[19]

QTF relies on *Mukand, Ltd. v. United States*, Slip Op. 13-41, 2013 WL 1339399 (CIT Mar. 25, 2013), to suggest that Commerce's supplemental questionnaire was insufficient.  *See* QTF Br. at 19.  While Commerce chose to elicit the same information on five separate occasions in *Mukand*, the case does not stand for the proposition that Commerce is required to issue multiple supplemental questionnaires.  2013 WL

---

[18] QTF appears to attribute its purported misunderstanding of the initial question to its former counsel's failure to adequately explain the question.  *See* QTF Reply at 3.  QTF was represented by Mr. Hume at the time it submitted its initial response and by Ms. Xiao when it submitted the supplemental response.  *See* QTF Initial Sec. A Resp.; QTF 2nd Suppl. Questionnaire Resp.  QTF states that once its new counsel "explained the definition of 'affiliation,'" QTF disclosed the familial relationship between Mr. Bai and QTF's legal representative in the supplemental response.  QTF Reply at 3.  However, even with its newfound understanding of the definition of affiliation, QTF maintained that it "never had any connection to Mr. Bai" or Golden Bird.  QTF 2nd Suppl. Resp. at 1.
[19] QTF's assertion that Commerce took no action between QTF's initial questionnaire response and the preliminary results of review is belied by the record.  *See* QTF Br. at 12-13.  During this time, the agency received and reviewed FGPA's allegations that QTF had misreported its affiliations, and issued a supplemental questionnaire to QTF addressing those allegations.  *See* Pet'rs' Deficiency Cmts.; QTF 2nd Suppl. Questionnaire.

1339399 at *6.  Rather, one supplemental questionnaire is enough.  *See Maverick Tube*

*Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017) (Commerce satisfied its

obligation under 19 U.S.C. § 1677m(d) when the respondent "failed to provide the

information requested in Commerce's original questionnaire, and the supplemental

questionnaire notified [the respondent] of that defect").

Commerce explained that additional questionnaires in this review were

unnecessary because "once QTF confirmed that Mr. Bai Wenxuan was the brother of

QTF's legal representative," the agency "had already collected [on its own] the required

information to complete its analysis of the QTF-entity's affiliations."  I&D Mem. at 33.  In

sum, the agency provided QTF two opportunities to provide accurate affiliation

information, and QTF failed to do so.  Commerce was not required to provide additional

supplemental questionnaires seeking the same information.

### 2. Commerce's Collapsing Determination is Supported by Substantial Evidence and in Accordance with Law

As set forth above, Commerce's regulations guide its decision to collapse two or

more entities.  *See* 19 C.F.R. § 351.401(f).  In this case, however, Commerce found that

QTF withheld information necessary to conduct that analysis.  I&D Mem. at 35.  Instead,

due to QTF's failure to cooperate to the best of its ability, the agency based its

collapsing decision on the application of adverse facts available.  *Id.* at 32, 35.

QTF and the separate rate respondents argue that Commerce failed to comply

with 19 C.F.R. § 351.401(f) by not making a finding, supported by substantial evidence,

that there is a "significant potential for manipulation" by the QTF-entity.  QTF Br. at 22-

30; Z&A Br. at 9-11.  Normally, Commerce determines whether there is a "significant

potential for manipulation" by evaluating the levels of common ownership, whether directors, managers, or officers within firms are affiliated, and whether operations of relevant entities are intertwined.  19 C.F.R. § 351.401(f)(2).  However, because QTF did not provide requested information on its affiliates, the agency lacked the information to evaluate this factor.  I&D Mem. at 35.

QTF should have been able to provide the basic affiliation information to which it had ready access.  I&D Mem. at 32-33.  "Because Commerce lacks subpoena power, Commerce's ability to apply adverse facts is an important one."  *Maverick Tube*, 857 F.3d at 1360 (quoting *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012)).  In this case, Commerce pointed to evidence on the record, which showed that garlic shipped to the United States in "Golden Bird's name[] was actually QTF's garlic".  I&D Mem. at 35 & n.231 (citation omitted).  To the agency, this "indicate[d that] there is a significant potential for the manipulation of price or production of QTF's garlic."[20]  *Id.*

---

[20] Commerce also found that Golden Bird was licensing its previous low rate to other Chinese exporters through a "scheme" where Golden Bird (owned by Mr. Bai) would ship the garlic to the United States, and the U.S. customers would pay Lianghe, a member of the QTF-entity (whose manager and legal representative was Mr. Bai's wife).  I&D Mem. at 31 & n.210 (describing the scheme) (citing, *inter alia*, Pet'rs Comments in Supp. of Harmoni's Fraud Claim, Part 1 (Apr. 5, 2016) ("Pet'rs 4/5/16 Letter Pt. 1") at 5, PR 102, CJA Vol. II, PJA Vol. II); *id.* at 8 (identifying Mr. Bai as owner or controller of Golden Bird); Prelim. Mem. at 10-11 (describing Mr. Bai's wife's role at Lianghe).  Evidence also showed that "following Golden Bird's receipt of an AFA rate at the conclusion of the 18th administrative review, QTF began shipping large amounts of garlic to the United States."  I&D Mem. at 31 & n.211 (citing, *inter alia*, Pet'rs 4/5/16 Letter Pt. 1).  Commerce thus found that QTF was "attempting to undermine the administrative review process," further necessitating the use of an adverse inference and need to collapse the QTF-entity.  *See id.* at 32.

at 35.  Moreover, because QTF failed to cooperate by providing necessary information, the agency reasonably concluded that "QTF cannot benefit from [its] failure."  *Id.*

The agency properly filled a gap in the record that QTF itself created.  *Cf. Zhaoqing New Zhongya Aluminum Co. v. United States*, 39 CIT __, __, 70 F. Supp. 3d 1298, 1305-06 (2015) (holding that that Commerce's decision to collapse three affiliated producers into a single entity was reasonable when "evidence regarding intertwined operations during the period of review was limited due to [two of those producers'] failure to cooperate").  With regard to QTF's assertion that Commerce's collapsing determination runs counter to the statutory mandate to calculate dumping margins as accurately as possible, any inaccuracies resulting from Commerce's use of adverse facts available are a function of QTF's failure to cooperate and provide accurate information.  *See id.* at 1306 (collapsing to address possible future manipulation "arises out of the basic purposes of the statue—determining current margins as accurately as possible") (internal quotation marks and citation omitted).

### 3.  Commerce's Denial of QTF's Request for Separate Rate is Supported by Substantial Evidence

Commerce concluded that QTF was not eligible for a separate rate and offered several reasons for its decision.  QTF's "inaccurate responses with respect to its affiliations were in response to questions in the 'Separate Rate' section of the [agency's initial] questionnaire."  I&D Mem. at 34.  Without this critical information, Commerce lacked the basic information necessary for determining whether QTF was eligible for a separate rate.  *Id.*  Moreover, record evidence confirmed that the QTF-entity is affiliated with companies that are part of the PRC-wide entity; thus, the other information that

QTF provided in its Section A response was unreliable.[21]  *Id.* at 34-35 & n.228 (citing

Affiliation Docs.).  Having found all of QTF's information unreliable, Commerce used

total AFA to find that the QTF-entity was not entitled to a separate rate.  *Id.* at 31, 35;

*see also id.* at 37.

        QTF asserts that the agency's use of total AFA is "unfairly and improperly

punitive."  QTF Br. at 15.  The court is not persuaded.  The instant case is analogous to

*Ad Hoc Shrimp*, in which a respondent repeatedly denied its affiliation with a third-

country company "until confronted with the public registration documents unequivocally

revealing the affiliation."  802 F.3d at 1356.  As a consequence, Commerce rejected the

respondent's separate rate information because it deemed "the entirety of [the

respondent's] submissions unreliable," and found that the respondent did not rebut the

presumption that it [was] part of the China-wide entity.   *See id.* at 1357-58.  The U.S.

Court of Appeals for the Federal Circuit ("Federal Circuit") affirmed Commerce's

determination to rely on total AFA rate because "the necessary information missing from

the record was . . . an accurate representation of [the respondent's] corporate structure

and indications of government control exercised through the company's Chinese

affiliates," and such information was deemed "core, not tangential" to Commerce's

separate rate analysis because it went "to the heart of [the respondent's] corporate

ownership and control."  *Id.* at 1356, 1357 (citations omitted).

---

[21] In its preliminary results, Commerce stated that two QTF-entity members, Lianghe and QXF, were subject to the instant review.  Prelim. Mem. at 10-11.  Neither of those companies submitted a separate rate certification or application.  *See id.* at 2 (listing the companies that made submissions).

Here, Commerce properly determined that QTF's misrepresentations rendered the entirety of its submissions unreliable when the information it withheld included the identity of its affiliates, at least some of which are part of the PRC-wide entity.  QTF's failure to provide the necessary affiliation information prevented Commerce from evaluating QTF's eligibility for a separate rate.  That separate rate inquiry is a binary question—QTF either is or is not eligible for a separate rate.  In that circumstance, when the agency is permitted to make an adverse inference, that inference must manifest itself in the answer to that binary question, in this case resulting in the denial of a separate rate.

### 4. Commerce's decisions to apply an adverse inference and collapse the QTF entity were not arbitrary and capricious

QTF also argues that the agency's decisions to apply an adverse inference and collapse the QTF entity were arbitrary and capricious.  QTF Br. at 7-10, 22.  "'[A]n agency's finding may be supported by substantial evidence,' yet 'nonetheless reflect arbitrary and capricious action.'"  *Changzhou Wujin Fine Chem. Factory Co. Ltd. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (quoting *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)).  While "the substantial evidence standard applies to review of factual determinations," the "the arbitrary and capricious (or contrary to law) standard" applies to review of the agency's reasoning.  *Id.* (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48-49 (1983)).  The agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines v.*

*United States*, 371 U.S. 156, 168 (1962)).  In reviewing the agency's explanation, the

court finds that the agency considered the relevant factors with respect to both

determinations that QTF challenges.  The agency's decision evinces a rational

connection between the record facts and the choice made.  The court finds no "clear

error of judgment" on the agency's part.  *See id.* (quoting *Bowman*, 371 U.S. at 168).

### E.  Conclusion

For the reasons set forth above, QTF's and Zhengyang and Alpha's motions for

judgment on the agency record are denied.  Commerce's application of total adverse

facts available and its determination to deny QTF a separate rate and collapse QTF with

six other entities are supported by substantial evidence and otherwise in accordance

with law.

### II.   NMGGC's Motion

### A.  Relevant Legal Framework

The antidumping duty statute provides that, in the anniversary month of an

antidumping duty order, "if a request for such a review has been received," Commerce

shall "review, and determine … the amount of any antidumping duty."  19 U.S.C.

§ 1675(a)(1).  Although the current statute requires Commerce to conduct such a review

if properly requested, the statute does not provide for "how Commerce should proceed if

a request, once made, is withdrawn."  *Glycine & More, Inc. v. United States*, 880 F.3d

1335, 1337 (Fed. Cir. 2018).  To address this situation, Commerce has promulgated a

regulation, which states:

> The [agency] will rescind an administrative review under this section, in
> whole or in part, if a party that requested a review withdraws the request
> within 90 days of the date of publication of notice of initiation of the

requested review. The [agency] may extend this time limit if the [agency]
decides that it is reasonable to do so.

19 C.F.R. § 351.213(d)(1).[22]  The regulation further provides: (1) a domestic interested

party may request a review "of specified individual exporters or producers covered by

an order" if it explains the reasons for the request;[23] (2) an exporter or producer covered

by the order may request a review of itself; and (3) an importer of the merchandise may

request a review of the exporter or producer of the merchandise imported by that

importer.[24]  19 C.F.R. § 351.213(b).

### B.  Relevant Facts

On November 28, 2015, NMGGC timely requested a review of Harmoni and

Jinxiang Jinma Fruits Vegetables Products Co., Ltd., a Harmoni affiliate.[25]  *See*

NMGGC Review Req.  Joey Montoya, Esq. ("Mr. Montoya") of Hume & Associates filed

the request on behalf of NMGGC,[26] and advised the agency that Mr. Montoya was

"handling this case independent from any member of [Hume & Associates] for the

purpose of avoiding the appearance of a conflict of interest."  *Id.* at 2.  NMGGC asserted

---

[22] The predecessor to the current regulation was 19 C.F.R. § 353.22.  *See* 19 C.F.R.
§ Pt. 351, Annex V; *Antidumping Duties*, 54 Fed. Reg. 12,742 (Dep't Commerce Mar.
28, 1989) (final rule).
[23] A domestic interested party is "a manufacturer, producer, or wholesaler in the United
States of a domestic product."  19 U.S.C. § 1677(9)(C).
[24] Commerce also has the ability to self-initiate a review.  *See* 19 C.F.R.
§ 351.213(d)(2).
[25] While NMGGC included both Harmoni and Jinxiang Jinma Fruits Vegetables
Products Co., Ltd. in its request, Commerce only selected Harmoni as a mandatory
respondent.  I&D Mem. at 7 n.36.  To that end, the court limits its discussion to
Harmoni.
[26] NMGGC identified its members as Stanley Crawford ("Mr. Crawford"), owner and
operator of El Bosque Farm of Dixon, New Mexico and Avrum Katz ("Mr. Katz"), owner
and operator of Boxcar Farm of Penasco, New Mexico.  NMGGC Review Req. at 1 n.1.

that its members are producers or wholesalers in the United States of fresh garlic,

seeking the review as a "domestic interested party" pursuant to 19 U.S.C. § 1677(9)(C).

*See id.*

NMGGC supplemented its initial review request on December 3, 2015 with

additional comments explaining to the agency "why investigating Harmoni [was]

important to the ability of NMGGC and to similar garlic producers throughout New

Mexico to compete in the fresh garlic market."  Suppl. Comments for the 21st Admin.

Review on behalf of NMGGC (Dec. 3, 2015) ("NMGGC Suppl. Review Req. Cmts") at 2,

PR 8, CJA Vol. I, PJA Vol. I.  NMGGC stated that Mr. Crawford had requested a review

of Harmoni in the preceding period of review ("AR 20"), but "Mr. Crawford was scared

off and withdrew his request after private investigators were sent [by Harmoni and

FGPA] to inspect his facility and pry into his business."  *Id.* at 4-5.

On January 9, 2016, two days after the initiation of AR 21, Mr. Montoya entered

an appearance on behalf of NMGGC and informed Commerce that he would be

representing NMGGC "without collaboration, conjunction, or advisement of any other

attorney of Hume & Associates []."  Application for Admin. Protective Order and Entry of

Appearance on Behalf of NMGGC (Jan. 9, 2016) ("Montoya Entry of Appearance") at 1-

2, PR 21, CJA Vol. I, PJA Vol. I.  He further stated that Hume & Associates "has

counsel representing opposing parties for [AR 21], however, said counsel has built a so-

called 'Chinese Wall' to avoid conflict of interest issues arising from representing clients

with adverse interest in the same proceeding."  *Id.* at 2.  Following Mr. Montoya's

appearance on behalf of NMGGC, Mr. Hume entered an appearance on behalf of QTF.

Entry of Appearance and Appl. for Admin. Protective Order on behalf of QTF (Jan. 12, 2016) ("Hume First Entry of Appearance"), PR 23, CJA Vol. I, PJA Vol. I.

On March 8, 2016, NMGGC notified the agency that Mr. Montoya was withdrawing from representation of NMGGC and stated that Hume & Associates would continue to represent NMGGC.  *See* 21st Admin. Review Withdrawal (Mar. 8, 2016), PR 56, CJA Vol. I, PJA Vol. I.  The following day, Mr. Hume entered an appearance on behalf of NMGGC.  *See* Notice of Appearance (Mar. 9, 2016) ("Hume Second Entry of Appearance"), PR 59, CJA Vol. I, PJA Vol. I.

On April 8, 2016, the agency issued a set of questions to NMGGC to evaluate whether its members are producers or wholesalers of fresh garlic and, thus, domestic interested parties that may request an administrative review.  *See* Letter from Commerce to NMGGC (Apr. 8, 2016), PR 116, CJA Vol. II, PJA Vol. II.  The agency requested information regarding the quantity of fresh garlic produced during the POR, the total production value, the total amount of investment in garlic production, the employment numbers for the POR, and other costs and activities related to fresh garlic production in the United States.  *See id.* at Attach. II.  NMGGC provided its members' responses to those questions on April 15, 2016.  *See* NMGGC Resp. to Gilgunn Letter Confirming NMGGC Members are Domestic Interested Parties as they are Producers or Wholesalers Within the United States of the Domestic Like Product – filed on Behalf of NMGGC Parts 1-3 (Apr. 15, 2016) ("NMGGC Questionnaire Resp."), CR 60-62, PR 137-39, CJA Vol. III, PJA Vol. III.  Relying on those responses, the agency issued a memorandum on June 3, 2016, finding that NMGGC and its individual members are

domestic producers of fresh garlic and had standing to request an administrative review

of Harmoni.  *See* Commerce's Mem. on Whether the Members of NMGGC are U.S.

Domestic Producers of Fresh Garlic (June 3, 2016) at 4 & nn.23-29, CR 104, PR 214,

CJA Vol. III, PJA Vol. III (citations omitted).

Specifically, the agency relied on information that Mr. Katz and Mr. Crawford

provided regarding each member's output, sales, investments, and labor expenses.  *Id.*

at 4.  The agency also relied on a statement by Mr. Katz with respect to NMGGC's

"stake" in the proceeding, which read:

> The price of my garlic is absolutely affected by changes in imported garlic
> price.  Cheap, imported Chinese garlic is used to set price.  People at my
> market stand ask us all the time why the supermarket prices are so much
> cheaper.  It is not unusual for someone to place their garlic on the scale,
> hear our price, and walk away.

*Id.* at 4-5 & n.32 (quoting NMGGC Questionnaire Resp. at page 1 of Mr. Katz's

response).  In this memorandum, Commerce acknowledged that Harmoni had made

several allegations of fraud by NMGGC members, but stated it would fully address the

arguments in the preliminary results, after giving the parties an opportunity to address

those allegations and other record filings.  *Id.* at 5.

In its preliminary results, Commerce continued to find that NMGGC's members

are domestic producers of fresh garlic and, therefore, the requested review of Harmoni

would continue.  Prelim. Mem. at 8.  Commerce also noted, however, that it had not had

time to consider all the recent factual submissions.  *Id.*

On December 14, 2016, shortly after Commerce issued the preliminary results,

Mr. Katz withdrew from NMGGC.  *See* Withdrawal of Avrum Katz from NMGGC (Dec.

14, 2016), PR 402, CJA Vol. IV, PJA Vol. IV.  Subsequently, on February 2017, Mr.

Katz submitted a letter to Commerce containing various allegations pertaining to

NMGGC and Mr. Hume.   I&D Mem. at 2 & n.11 (citing untitled Letter from Avrum Katz

to Commerce (Feb. 10, 2017) ("Katz 2/10/17 Letter"), PR 440, CJA Vol. IV, PJA Vol.

IV).[27]  Mr. Katz wanted to address "fraud recently discovered in connection with [AR 21]

concerning the fraudulent and misleading scheme perpetrated by Mr. Hume and Mr.

Crawford."  Katz 2/10/17 Letter at 1.  Among other things, he alleged that Mr. Hume

"intentionally misled" Mr. Katz on the nature and purpose of AR 21.  *Id.* at 2.  Mr. Katz

stated that he was unaware that Mr. Hume was simultaneously representing Chinese

clients, and alleged that Mr. Hume was using "small New Mexico farmers as puppets to

petition the government for his Chinese clients."  *Id.* at 2-3.  He further alleged that Mr.

Hume was compensated $100,000 by his Chinese clients to initiate a review request

with respect to Harmoni, and Mr. Crawford received $50,000 and garlic harvesting

equipment for participating in the review request.  *Id.* at 3.  Mr. Katz expected he would

receive similar payment in exchange for his participation.  *Id.* at 3-4.  Moreover,

contradicting his earlier statement in the questionnaire response, Mr. Katz stated:

> Boxfarm's fundamental problem was, and is, a lack of capital for
> infrastructure to increase our production.  [Mr.] Hume and [Mr.] Crawford
> led us to believe that if we went along with their narrative and forced
> Harmoni out of business, money would come from China to take care of
> some of those infrastructure problems.

*Id.* at 5.

---

[27] Mr. Katz filed the submission on February 2, 2017, but Commerce rejected it on procedural grounds.  Mr. Katz then resubmitted the letter on February 10, 2017, and Commerce accepted the letter.  *See* I&D Mem. at 2 n.11 (citations omitted).

In light of this information, Commerce established deadlines by which parties could submit comments and rebuttal information about Mr. Katz's allegations.  *See* I&D Mem. at 2-5.  The agency also held a public hearing on May 11, 2017.  *Id.* at 5.

After reviewing the additional information placed on the record, Commerce concluded that it could no longer credit NMGGC's submissions.  *See id.* at 17-23.  Commerce noted three examples to demonstrate that NMGGC and Mr. Hume made representations to the agency that were contradicted by record evidence.  *Id.* at 18-21.  Those representations undermined NMGGC's and Mr. Hume's credibility and the credibility of their remaining submissions on the record, including claims that NMGGC is a domestic interested party.  *See id.* at 18, 20.  Thus, "because [] NMGGC lack[ed] credibility, its review request was illegitimate *ab initio*," and the agency rescinded its review of Harmoni.  *Id.* at 18.

The three factual claims made by NMGGC and Mr. Hume that Commerce discussed were whether: (1) Chinese exporters and businessmen were involved in NMGGC's review request; (2) members of NMGGC and Mr. Hume received any direct or indirect compensation for their participation in AR 21; (3) Mr. Crawford withdrew his previous review request because he was intimidated by a private investigator sent by Harmoni.  *Id.* at 18-21.  Commerce identified additional issues that caused the agency concern regarding NMGGC's submissions.  Commerce explained that Mr. Katz's February 2017 submission raised questions about NMGGC's initial questionnaire responses upon which Commerce had relied in determining that NMGGC was a domestic interested party.  *Id.* at 21.  Commerce also identified "serious problems" with

NMGGC's certifications.  *Id.* at 22.  In sum, Commerce concluded that it could not

consider any of the information that NMGGC submitted to be reliable, and therefore,

NMGGC failed to demonstrate that it was a domestic interested party.  *Id.* at 23.

### C. Parties' Arguments

NMGGC challenges Commerce's authority to rescind its review of Harmoni,

Commerce's factual findings and credibility determinations with respect to NMGGC, and

Commerce's decision not to refer the allegations of collusion between Harmoni and

FGPA to the U.S. Department of Justice ("DOJ").  *See* NMGGC Br. at 8-13, 16-39.

NMGGC frames the issue of Commerce's authority to rescind its review of Harmoni as a

*Chevron* step one inquiry, arguing that once a review is initiated of any

producer/exporter, all producers/exporters from the subject country must be reviewed

and rescission of the review is not permitted.[28]  *Id.* at 8, 16-21.  Next, NMGGC contends

that Commerce's factual findings and credibility determinations with respect to NMGGC

were arbitrary, capricious, an abuse of discretion, and unsupported by substantial

evidence.  *Id.* at 21-35.  Further, NMGGC claims that Commerce abused its discretion

by failing to request that the DOJ investigate and prosecute NMGGC's allegations that

---

[28] The two-step framework provided in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–45 (1984), guides judicial review of Commerce's interpretation and implementation of the antidumping and countervailing duty statutes.  *See Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1344 (Fed. Cir. 2017).  First, the court must determine "whether Congress has directly spoken to the precise question at issue."  *Id.* (quoting *Chevron*, 467 U.S. at 842).  If Congress's intent is clear, "that is the end of the matter," and the court "must give effect to the unambiguously expressed intent of Congress."  *Id.* (quoting *Chevron*, 467 U.S. at 842-43).  However, "if the statute is silent or ambiguous," the court must determine whether the agency's action "is based on a permissible construction of the statute."  *Id.* (quoting *Chevron*, 467 U.S. at 843).

Harmoni and the FGPA "engag[ed] in collusion" and "effectively established a monopoly in trade for Chinese garlic." *Id.* at 39.

The Government and FGPA aver that 19 U.S.C. § 1675 is silent on the issue of rescission and, therefore, Commerce's authority to rescind a review of a producer/exporter when no requests are pending is a *Chevron* step two inquiry. *See* Gov. Resp. at 42; FGPA Resp. at 23-25.   They argue that under the *Chevron* step two analysis, Commerce's rescission policy is a permissible construction of the statute.[29] Gov. Resp. at 42-46; FGPA Resp. at 26-27.  Moreover, the Government, FGPA, and Harmoni argue that the agency's factual findings are supported by substantial evidence, and urge the court to defer to Commerce's credibility findings. *See* Gov. Resp. at 37-41; Harmoni Resp. at 24-38; FGPA Resp. at 28-29.  FGPA and Harmoni further aver that the agency properly concluded it lacked authority to pursue a criminal action against Harmoni.[30]  FGPA Resp. at 39; Harmoni Resp. at 45.

### D.  Analysis

#### 1.  Commerce's Rescission Policy is a Permissible Construction of the Statute

As previously stated, the statute provides for a review of an antidumping duty order when Commerce receives a request for such a review.  19 U.S.C. § 1675(a)(1). While specifying that Commerce shall conduct a review upon request, the statute does not  provide for "how Commerce should proceed if a request, once made, is

---

[29] Harmoni likewise argues that NMGGC's arguments "ignore directly controlling congressional intent, judicial precedent, and longstanding administrative practice." Confidential Def.-Int. Harmoni's Am. Resp. to Pls.' Rule 56.2 Mot. for J. on the Agency R. ("Harmoni Resp.") at 40-44, ECF No. 52.

[30] The Government did not address this issue in its brief.

withdrawn."[31]   *See Glycine & More,* 880 F.3d at 1337.   Accordingly, pursuant to

*Chevron*, the court must determine whether Commerce's interpretation of 19 U.S.C.

§ 1675(a)(1) as allowing the agency to rescind a review upon the withdrawal of the

request(s) upon which the review was initiated is a "permissible construction of the

statue."[32]   *Chevron*, 467 U.S. at 842-43.

Section 1675(a) previously provided for mandatory annual reviews of

antidumping duty orders.  *Floral Trade Council of Davis, Cal. v. United States*, 888 F.2d

1366, 1369 (Fed. Cir. 1989) (citing 19 U.S.C. § 1675(a)(1) (1982)); *see also* Trade

Agreement Act of 1979, Pub. L. No. 96–39, § 751, 93 Stat 144.  In 1984, Congress

amended the statute to require review only when the agency received such a request or

upon the agency's initiative.  Trade and Tariff Act of 1984, Pub. L. No. 98–573, tit. VI,

§ 611(a)(2), 98 Stat. 2948, 3031; *Floral Trade Council of Davis*, 888 F.2d at 1369.  The

legislative history associated with the 1984 amendments demonstrates that Congress

recognized that an "increasing number of outstanding orders subject to review each

year impose[d] an unnecessarily heavy burden on [Commerce's] limited staff

---

[31] Commerce's regulation, 19 C.F.R. § 351.213(d)(1), contains two provisions that address how Commerce proceeds when a review request is withdrawn: the first deals with the effect of a party's withdrawal of a review request, if such withdrawal occurs within 90 days, and the second deals with Commerce's discretion to extend the 90-day time limit to withdraw a request.  While *Glycine & More* concerned Commerce's discretion to extend the 90-day time limit, 880 F.3d at 1339, the court reached that question only after finding that, while § 1675 required Commerce to commence a review if properly requested, it left open the question whether any such review must continue upon withdrawal of the underlying request.

[32] NMGGC did not withdraw its request for review of Harmoni; nevertheless, it led with this argument, suggesting that even if Commerce's reconsideration of NMGGC's status was supported by substantial evidence, Commerce was legally obligated to complete the review of Harmoni.

resources."  H.R. REP. No. 98-725, at 22-23 (1984), *as reprinted in* 1984 U.S.C.C.A.N.

5127, 5149.  This amendment was intended "to reduce the administrative burden on

[Commerce] of automatically reviewing every outstanding order even though

circumstances do not warrant it or parties to the case are satisfied with the existing

order."  *Id.*; *see also* H.R. REP. NO. 98-1156, at 181 (1984) (Conf. Rep.), *as reprinted in*

1984 U.S.C.C.A.N. 5220, 5298 (explaining that the amendment was intended to "limit

the number of reviews in cases in which there is little or no interest, thus limiting the

burden on petitioners and respondents, as well as the administering authority").   The

House Conference Report also indicates that Commerce was to "provide by regulation

for the assessment of antidumping and countervailing duties on entries for which review

is not requested. . . ."  H.R. REP. NO. 98-1156, at 181 (1984) (Conf. Rep.), *as reprinted*

*in* 1984 U.S.C.C.A.N. 5220, 5298.

    "Commerce promulgated the [withdrawal] regulation in essentially its current form

in 1989."  *Glycine & More, Inc. v. United States*, 39 CIT __, __, 107 F. Supp. 3d 1356,

1365 (2015), *aff'd,* 880 F.3d 1335 (Fed. Cir. 2018); *see also Antidumping Duties,* 54

Fed. Reg. at 12,778.  Consistent with the statute's legislative intent, the regulation

provides that Commerce will rescind a review "if a party that requested a review

withdraws the request within 90 days of the date of publication of notice of initiation of

the requested review."  19 C.F.R. § 351.213(d)(1).  In other words, the regulation is on

par with the legislative intent that Commerce not conduct a review when interest in such

a review is absent.

Congress adopted a statutory provision that requires Commerce to conduct an administrative review upon request, but does not answer what Commerce is to do when that requisite request is withdrawn.  Commerce acted upon this implicit legislative delegation by adopting 19 C.F.R. § 351.213(d)(1) and, so long as that regulation provides a reasonable construction of the statute, it is not to be disturbed.  *Chevron*, 467 U.S. 843-44.  NMGGC's claims that Commerce's regulation is contrary to the statute are unpersuasive.  While recognizing that the statute is silent on withdrawals of review requests, NMGGC contends that "the Act specifies affirmatively the procedures Commerce must follow and these procedures negate rescissions once Commerce publishes a notice of the review in the Federal Register."  NMGGC Br. at 8 (citing 19 U.S.C. § 1675(a)(1),(2)); *id.* at 16-17.

Section 1675(a)(1) establishes the procedural groundwork for when reviews must commence once Commerce receives a request for review.  *See* 19 U.S.C. § 1675(a)(1) (instructing Commerce to initiate reviews "[a]t least once during each 12-month period . . . if a request for such review has been received . . .").  This language predicates Commerce's obligation to conduct a review only upon receiving a review request (and after publishing the notice).  The language does not address a situation when the request is later withdrawn, let alone mandate that Commerce complete the review in all circumstances once the agency publishes the notice.  Such a reading would run contrary to the legislative intent of easing the administrative burden on Commerce and preserving its limited staff resources when industry interest is lacking.

In *Glycine & More*, the Federal Circuit analyzed whether the Court of International Trade properly remanded Commerce's decision to continue a review of a company for which all review requests had been withdrawn, even though the last request was withdrawn after the 90-day deadline set forth in the agency's regulations. *See* 880 F.3d at 1342-44.  The Federal Circuit affirmed the lower court's opinion that Commerce could have reasonably granted an extension to allow the requesting party to withdraw the review request because Commerce received the request a few days after the deadline, the agency had not devoted significant resources to the review, and all other parties that had requested review of the company had filed timely withdrawals.[33] *Id.* at 1342, 1345.  If NMGGC's interpretation of the statute is correct, that once initiated, a review may not be rescinded by Commerce, then the Federal Circuit could not have reached the result it did—Commerce would have been statutorily required to complete the review.

NMGGC cites to 19 U.S.C. § 1675(a)(2) and 19 U.S.C. § 1677f-1(c)(1) to suggest that Commerce is required to review each entry of merchandise for *all* exporters and producers when it conducts a review, regardless of whether a request is made for the particular producer/exporter of the entry.  *See* NMGGC Br. at 18-19 (arguing that "the Act does not authorize Commerce to allow requests that specify

---

[33] The agency's initial decision to complete the review was based on a guidance document interpreting 19 C.F.R. § 351.213(d)(1), which impermissibly limited the scope of granting an extension to withdraw a review request.  *Glycine & More*, 880 F.3d at 1344.

'individual exporters or producers'"). NMGGC, however, fundamentally misunderstands the antidumping duty law.

Section 1675(a)(2) requires Commerce, for purposes of determining the amount of a dumping duty pursuant to section 1675(a)(1)(B) to "determine (i) the normal value and export price (or constructed export price) of each entry of the subject merchandise, and (ii) the dumping margin for each such entry." 19 U.S.C. § 1675(a)(2). Nothing in subsection (a)(2) expands the breadth of the review being conducted pursuant to subsection (a)(1) to all entries subject to the order. In fact, while section 1675(a)(1) provides for a review upon request, nothing in that provision suggests that it must be a review of the order as a whole. Because the review is to "determine … the amount of any antidumping duty" and such duties are calculated on a company-specific basis, the better reading of section 1675(a)(1) is that it provides for company-specific reviews upon request.[34]

Simple reference to the conduct of "a review" does not predetermine the breadth of the proceeding. Instead, the breadth of any "review" is determined by the context of the provision giving rise to the proceeding. For example, section 1675(a)(2)(B) provides for company-specific reviews of new exporters and producers. On the other hand,

---

[34] Indeed, subsection (a) is titled, "[p]eriodic review of amount of duty," not "periodic review of an order," with subsection (a)(1)(B) referring to the review and determination of "the amount of any antidumping duty." Thus, the "request for such a review" provided for in subsection (a)(1) is a request for a review of an amount of duty, which amounts are company-specific. Because antidumping duties are imposed pursuant to a particular antidumping duty order, the request for review is temporally aligned with publication of that order; however, that does not mean that the review must encompass the order as a whole, or all exporters/producers subject thereto.

section 1675(b) provides for changed circumstance reviews, whereby Congress

specified that it is the determination resulting in the antidumping order that is reviewed.

Similarly, section 1675(c) provides for five year (sunset) reviews and, therein, Congress

specified that the review is of the continued need for the order.  Thus, as considered

herein, it is clear that Commerce's interpretation of a review pursuant to section

1675(a)(1) as a company-specific exercise is a reasonable interpretation of the statute.

NMGGC's argument regarding section 1677f-1(c)(1) is similarly unconvincing.

That subsection provides that, generally, the agency must determine an individual

weighted-average dumping margin for each known exporter and producer of the

merchandise under review, but allows the agency, in certain circumstances, to limit its

examination to "exporters and producers accounting for the largest volume of the

subject merchandise from the exporting country that can be reasonably examined."  19

U.S.C. § 1677f-1(c).  While the starting point for the application of the provision allowing

selection of the largest exporters is the number of companies involved in the review,

nothing in this language suggests that it requires Commerce to expand the review to

include exporters or producers for which a review was not requested.  Plaintiff's

argument again fails.

Furthermore, Commerce's regulations provide that a domestic interested party

may request a review "of specified individual exporters or producers covered by an

order" if it explains the reasons for the request.  19 C.F.R. § 351.213(b)(1).

Commerce's ability to rely on this regulation to review named producers/exporters and

to decline to review other exporters not expressly named in the review request was

tested and affirmed soon after its adoption by the agency in its original form.[35]  In *Floral*

*Trade Council*, 888 F.2d at 1369, the Federal Circuit held that requiring the review

requester to name the specific party to be reviewed is "consistent with and promotes the

articulated statutory purpose of reducing [Commerce's] burden in reviewing outstanding

orders."  The court affirmed Commerce's decision not to review certain companies not

adequately identified in the review request, while the review of other identified

companies went forward.  NMGGC's argument cannot be squared with *Floral Trade*

*Council's* affirmance of the review of some, but not all, foreign producers and exporters

subject to the order in question.[36]  Rather than attempt to distinguish or explain *Floral*

*Trade Council*, NMGGC ignores it.[37]

---

[35] Neither passage of the Uruguay Round Agreements Act ("URAA") in 1994 nor the
implementing regulations adopted by Commerce thereafter changed the statutory or
regulatory landscape in any way relevant to this analysis.  Moreover, Commerce's
interpretation of the statute, as implemented by its regulations, as providing for
company-specific review upon request, was well-established and well-known during
consideration of the URAA, and Congress took no steps to alter or clarify the statute in
any relevant fashion in that Act.  *See N.L.R.B. v. Bell Aerospace Co. Div. of Textron*,
416 U.S. 267, 275 (1974) (Congressional failure to revise or repeal an agency's
interpretation of the statue it administers is persuasive evidence that the interpretation is
the one intended by Congress).
[36] Similarly, in *Transcom, Inc. v. United States,* 182 F.3d 876, 880-83 (Fed. Cir. 1999),
the Federal Circuit held that Commerce violated its statutory and regulatory notice
obligations when it reviewed an exporter from a non-market economy country which had
not been named in the notice of initiation, and the notice contained no indication that
unnamed exporters were subject to the review.  Again, the Federal Circuit would not
have reached this decision if Commerce was required to calculate antidumping duty
margins for all exporters.
[37] Plaintiff generally cites *Floral Trade Council of Davi*s as setting the standard for
reviewing the validity of a regulation, NMGGC Br. at 6, but does not otherwise address
its holding.

For these reasons, Commerce has authority to conduct reviews limited to named companies and to rescind reviews when the request has been withdrawn. Consequently, NMGGC's appeal of Commerce's rescission of the review of Harmoni turns on the reasonableness of the agency's decision that NMGGC's review request was illegitimate, leading to the rescission of the review *ab initio*, the issue to which the court now turns.

## 2. Commerce's Factual Findings and Credibility Determinations Are Supported by Substantial Evidence

In the *Final Results*, Commerce identified three examples of misrepresentations by Mr. Hume and NMGGC that undermined their credibility and led the agency to conclude that NMGGC's submissions were unreliable.  I&D Mem. at 18-21.  Commerce noted additional concerns that caused the agency to question many of NMGGC's questionnaire responses and other submissions.  *Id.* at 21-23.  Ultimately, because the agency "determine[d] that the entirety of [] NMGGC's information, including its garlic production information, [was] unusable," it found that NMGGC "failed to demonstrate that it is a domestic interested party.  As such, there [was] no valid review request of Harmoni."  *Id.* at 23.  For the reasons discussed below, the agency's credibility determinations and factual findings are supported by substantial evidence.

### i. Commerce's finding that NMGGC misrepresented that Chinese exporters and businessmen were not involved in NMGGC's review request

Substantial evidence supports Commerce's credibility finding with respect to NMGGC's claim that Chinese exporters or businessman did not have any involvement in its review request.  I&D Mem. at 18 & n.109 (citation omitted).  Specifically,

Commerce cited email exchanges from 2010 in which Mr. Hume and Mr. Wang

discussed a plan to "attack [the] Harmoni issue," (i.e. to get Commerce to review

Harmoni).  I&D Mem. at 18-19 & nn.110-111 (citing Harmoni New Factual Information in

Resp. to Mar. 7, 2017 Mem. (Mar. 9, 2017) ("Harmoni 3/9/17 Letter"), Ex 6 (email), CR

239, PR 466, CJA Vol. IV at ECF p. 771, PJA Vol. IV).  Commerce then cited a more

detailed outline of a plan, discussed between Mr. Hume and an employee of Mr. Wang

in 2014, to get Commerce to review Harmoni.  I&D Mem. at 19 & n.112 (citing Harmoni

Rebuttal Factual Information (Feb. 21, 2017) – Part 2 ("Harmoni 2/21/17 Letter Pt. 2"),

Ex. 3 (email), PR 455, CJA Vol. IV, PJA Vol. IV).  Specifically, Mr. Hume told his

Chinese client:

> I have been considering [] filing a review request against Harmoni in my
> name (H[ume] & A[ssociates]) and letting [another Hume & Associates
> employee] do the responses.  We could "create a Chinese wall" where
> lawyers in the same firm represent clients on different sides of a
> proceeding . . . to give teh [sic] appearance they are not working together.
> Of course, I need a "client" that is a US garlic producer.  NOTE: This is
> only an option, but one that can work since I know most of the issues and
> Huamei can do the other work.  In fact, Huamei can do the filings from
> China. . .

Harmoni 2/21/17 Letter Pt. 2, Ex. 3 (email).

    The following year, Hume & Associates attempted to locate U.S. garlic producers

and, when contacting solicitants, "[did] not indicate [the firm was] Chinese affiliated."

NMGGC Reply to 3/3/17 Harmoni Submission (Mar. 9, 2017) – Part 6 ("NMGGC 3/9/17

Letter Pt. 6"), Ex. 9 (email), PR 472, CJA Vol. IV at ECF p. 937, PJA Vol. IV; *see also*

I&D Mem. at 19 & n.113.  Commerce also had an email communication, dated

November 12, 2015, in which Mr. Hume directed Mr. Montoya on the contents of

NMGGC's review request for AR 21.  I&D Mem. at 19 & n.114 (citing NMGGC 3/9/17

Letter Pt. 6, Ex. 9 (email) at ECF p. 939).  This direction, however, was inconsistent with

Mr. Montoya's representation in the review request itself, that he was representing

NMGGC "without collaboration, conjunction, or advisement of any other attorney of

Hume & Associates."[38]  Montoya Entry of Appearance.  Thus, Mr. Hume's and

NMGGC's actions before the agency were consistent with Mr. Hume's 2014 plan of

finding a "client" and creating a so-called "Chinese wall" to give the "appearance" that

the attorneys within the same firm are not working together.  *See* Harmoni 2/21/17

Letter Pt. 2, Ex. 3 (email).

---

[38] As stated above, in the beginning of the underlying proceeding, Mr. Hume entered an appearance on behalf of QTF, a Chinese respondent.  *See* Hume First Entry of Appearance.  Mr. Montoya entered an appearance on behalf of NMGGC, the purported domestic producer.  *See* Montoya Entry of Appearance.  After Mr. Montoya withdrew his representation of NMGGC, Mr. Hume entered an appearance on behalf of NMGGC.  *See* Hume Second Entry of Appearance.  The record indicates that Mr. Hume represented both QTF and NMGGC for several months.  *Compare* Hume Second Entry of Appearance (dated March 9, 2016), *with* Letter from Hume & Associates LLC to Secretary of Commerce Pertaining to QTF Withdrawal as Councel [sic] to QTF (June 22, 2016), PR 220, ECF No. 23-2.  Representing both the domestic producer and foreign exporter simultaneously in the same proceeding would undoubtedly raise conflict of interest concerns.  Indeed, Mr. Montoya acknowledged that the interests of NMGGC and QTF were "adverse" when he represented to the agency that Hume & Associates had created a "Chinese Wall" to address the conflict of interest.  *See* Montoya Entry of Appearance.  The court raised these ethical concerns with Mr. Hume during oral argument, but did not receive a satisfactory response.  While those concerns remain to be addressed, the court's task here is to determine whether substantial evidence supports Commerce's decision to rescind its review of Harmoni, and whether that decision is in accordance with law.  After careful consideration, the court has determined that it is able to apply that standard of review based on the record before it and need not resolve its ethical concerns with Mr. Hume's conduct prior to rendering a decision in this case.

Plaintiff disputes that the cited evidence reflects "involvement by Chinese businessmen," and argues that "the absence of involvement is obvious by the fact that Harmoni had all of [Hume & Associates] emails and produced no evidence of involvement in [AR 21]."  NMGGC Br. at 10 (citing Harmoni Pre-Prelim. Comments (Nov. 21, 2016), Ex. 2, CR 171, PR 376, CJA Vol. III, PJA Vol. III; Harmoni 2/21/17 Letter Pt. 2, Exs. 6-7; Harmoni 3/9/17 Letter, Ex. 6; Harmoni 3/9/17 Letter, Ex. 7, ECF No. 87).  However, while it is clear that Harmoni did obtain access to some of Hume & Associates' emails, the record does not indicate that Harmoni had all of the firm's emails.  Moreover, those emails do reflect involvement by Mr. Wang in Mr. Hume's plan to get Commerce to review Harmoni as early as 2010.[39]  *See* Harmoni 3/9/17 Letter, Ex 6.  Mr. Wang is part owner of Huamei Consulting and, from November 2015 to November 2016, owned Golden Bird, a Chinese garlic company found to be affiliated with QTF.  NMGGC Reply to 2/10/2017 Katz Submission (Feb. 20, 2017) ("NMGGC 2/20/17 Letter"), Ex. 2 (Decl. of Wang Ruopeng) ("Wang Decl.") ¶ 1, PR 450, CJA Vol. IV, PJA Vol. IV; *see also* I&D Mem. at 8.

NMGGC also argues that Commerce failed to address other evidence supporting the conclusion that Chinese exporters and businessmen were not involved in NMGGC's

---

[39] NMGGC also supports its position with a citation to its March 31, 2017 rebuttal brief to the agency.  NMGGC Br. at 25 & n.62 (citation omitted).  That brief relies on Mr. Crawford's declaration that he and Mr. Katz were not paid by any Chinese company.  Rebuttal Br. Filed on Behalf of NMGGC and El Bosque Farm – Part 1 (Mar. 31, 2017) at 13 & n.38, PR 509, CJA Vol. IV, PJA Vol. IV).  Commerce, however, found Mr. Crawford not credible.  *See* I&D Mem. at 18 (finding that NMGGC lacks credibility); *id.* at 23 (finding that Mr. Crawford's inability to provide complete and accurate responses tainted all of his statements).  Commerce's decision not to credit Mr. Crawford's self-serving declaration was reasonable.

Case 1:17-cv-00166-MAB   Document 39   Filed 11/26/18   Page 45 of 53

Consol. Court No. 17-00146                                                Page 45

review request.  *See* NMGGC Br. at 24.  In particular, NMGGC points to Mr. Wang's

declaration wherein he stated that NMGGC's review request "was done on their own"

(referring to NMGGC) and "ha[d] nothing to do with any Chinese garlic company."

NMGGC Br. at 24 & n.57 (quoting Wang Decl. ¶ 10).  NMGGC also points to Mr.

Hume's declaration wherein he stated that he was "pursuing [his] interest in finding a

garlic farmer to file a review request."  NMGGC Br. at 24 & n.59 (citing I&D Mem. at 19).

        As noted, Mr. Wang is associated with Huamei Consulting, Wang Declaration

¶ 1, "a Chinese consulting firm" that "works with [Hume & Associates]," I&D Mem. at 8.

Although not explicitly stated, it may reasonably be inferred that by concluding Mr.

Hume and NMGGC were not credible, Commerce also discredited Mr. Wang's

declaration.  *See* I&D Mem. at 23 (stating NMGGC's "inability to provide complete and

accurate responses taint all of the . . . information that [it has] submitted on the record of

this review").  Alternatively, "it may be inferred" from Commerce's failure to discuss

certain evidence that the agency "determined that the [] evidence was insignificant,

immaterial, or not seriously undermining enough to merit discussion."  *Diamond*

*Sawblades Mfrs. Coal. v. United States*, Slip Op. 13-130, 2013 WL 5878684, at *7 (CIT

Oct. 11, 2013).  The substantial evidence standard does not preclude the possibility that

some record evidence may support an alternative conclusion.  Here, when the record

actions of Mr. Hume, his associate, and his client (about whom Commerce identified

serious questions) are consistent with the documented plan Mr. Hume concocted with

his Chinese clients, the court has no difficulty in finding that the agency's decision was

based on substantial evidence.

     *ii.   Commerce's finding that NMGGC misrepresented whether its members or Mr. Hume received direct or indirect compensation for their participation in AR 21*

NMGGC made several claims to the agency that neither its members nor Mr. Hume received direct or indirect compensation for their participation in AR 21.[40]   I&D Mem. at 20 & n.117 (citation omitted).  Substantial evidence supports Commerce's finding that NMGGC's representations were unreliable.

The record shows that Mr. Hume paid Mr. Crawford $50,000 following his withdrawal of the Harmoni review request in AR 20.[41]  I&D Mem. at 20 & n.119 (citing Boxcar Farm Rebuttal Comments (Feb. 21, 2017) ("Katz 2/21/17 Letter"), Ex. 1 (email), CR 235, PR 452, CJA Vol. IV at ECF pp. 511-15, PJA Vol. IV) (Mr. Crawford stating "I received payment re: AR 20"); s*ee also* Katz 2/10/17 Letter at 3 (stating that "Mr. Crawford had received $50,000 from some 'very nice' Chinese businessman in March 2015 for withdrawing his review request in AR 20").  Shortly thereafter, in July of 2015, Mr. Hume and Mr. Crawford traveled to China, and Mr. Wang partially paid for their trip. I&D Mem. at 20 & n.120 (citing Wang Decl.); *see also* Wang Decl. ¶ 11.

---

[40] *See* NMGGC's 2/20/17 Letter at 15 ("NMGGC was not financed by any Chinese entity; there were no promises of any future compensation"); *id.*, Ex. 4 (Decl. of Robert T. Hume (Feb. 16, 2017) ¶ 4 ("I was not compensated, nor did I expect any compensation, for my time or expertise in representing the NNMGGC [sic] in [AR 21]"); Stanley Crawford Decl. in Resp. to Avrum Katz's Req. for Recons. (Feb. 6, 2017) ("Crawford Decl.") ¶ 13, PR 428, CJA Vol. IV, PJA Vol. IV ("I have received no compensation for my participation in AR 21").

[41] This payment occurred shortly before Mr. Montoya commenced efforts to contact additional U.S. garlic growers to establish a group to request that Commerce review Harmoni in AR 21.  *See* I&D Mem. at 19 & n.113 (citing NMGGC 3/9/17 Letter Pt. 6, Ex. 9).

Evidence also shows that Mr. Hume provided $15,000 to Mr. Katz between June and November 2016. *Id.* at 20 & n.118 (citing NMGGC 2/9/17 Letter, Ex. 4 (personal checks for $5,000 and $10,000 from Mr. Hume to Mr. Katz), ECF No. 87. Thereafter, in March of 2017, Mr. Crawford received garlic processing equipment, "shipped from China for use by coalition members." *Id.* at 20 & n.121-122 (citing Crawford Decl. Harmoni 3/9/17 Letter, Ex. 4 (importation of processing equipment shipped from Qingdao, China to Hume & Associates)); *see also* Crawford Decl. ¶ 15.

NMGGC does not dispute any of these transfers of funds or equipment or that Mr. Wang partially paid for Mr. Crawford's and Mr. Hume's trip to China in July of 2015. *See* NMGGC Br. at 32. Instead, NMGGC asserts that the $50,000 payment to Mr. Crawford was "was an unexpected gift from Mr. Hume," arising out of Mr. Crawford's participation in AR 20 and "willing[ness] to fight Harmoni." *Id.* at 31. Regarding Mr. Wang's partial payment of Mr. Crawford's and Mr. Hume's trip to China, NMGGC attributes those expenses to Chinese hospitality. *Id.* at 12. NMGGC states that Mr. Crawford's payment of $5,000 to Mr. Katz was "charity to a beleaguered farmer," whereas the $10,000 was a loan. *Id.* at 11-12.

Commerce identified record evidence, which showed that Mr. Hume's Chinese clients made monthly payments to Hume & Associates throughout 2016.[42] I&D Mem. at

---

[42] Commerce stated that Mr. Hume also received a $100,000 payment between February and May of 2016 from his Chinese clients. I&D Mem. at 20-21 & n.124 (citations omitted). The record evidence upon which Commerce relied in support of this statement does not establish that Mr. Hume received $100,000 between February and May of 2016. *See* Harmoni 2/21/17 Letter Pt. 2, Ex. 6 at ECF pp. 587-94 (Aug & Sep. 2016 emails); NMGGC Reply to 3/3/17 Harmoni Submission (Mar. 9, 2017) – Part 5 ("NMGGC 3/9/17 Letter Pt. 5"), Ex. 7 (retainer agreement between Hume & Associates

20-21 & nn.123-24 (citations omitted).  Commerce concluded that while his Chinese

clients were compensating Mr. Hume, Mr. Hume was compensating Mr. Katz and Mr.

Crawford.  *Id.* at 21.  In fact, a retainer agreement, dated January 1, 2016, between

Hume & Associates and Huamei Consulting states that Hume & Associates was to

receive $13,500 per month to represent clients of Huamei Consulting at the Court of

International Trade in cases concerning the 16th through 19th administrative reviews of

the *AD Order*.  NMGGC 3/9/17 Letter Pt. 5, Ex. 7; *see also* Wang Decl. ¶ 16 (the

$13,500 monthly payments were for "office expenses, office rent, payments for [Mr.

Hume's] staff, and his work, [including] . . . travel expenses.").

        While NMGGC attempts to explain the evidence and invites the court to interpret

the evidence in a different way, "[a]n agency finding may still be supported by

substantial evidence even if two inconsistent conclusions can be drawn from the

evidence."   *Ad Hoc Shrimp*, 802 F.3d at 1348 (quoting *Consolo v. Fed. Mar. Comm'n*,

383 U.S. 607, 620 (1966)).  To the extent NMGGC argues that the evidence before the

agency "could be open to multiple interpretations, its argument does not require, or

even allow, reversal." *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056,

---

& Huamei Consulting), PR 471, CJA Vol. IV at ECF pp. 921-23, PJA Vol. IV.  The
Government points to additional evidence as establishing that Hume & Associates
received $100,000 from Mr. Hume's Chinese clients during the pendency of the instant
review.  Gov. Resp. at 33 (citing Katz 2/10/17 Letter at 3; Harmoni Pre-Prelim.
Comments (Nov. 21, 2016), Ex. 2 (email exchange on August 7 and 13, 2014), CR 171,
PR 376, CJA Vol. III, PJA Vol. III).  While the cited evidence does not adequately
support a conclusion that Mr. Hume received "a payment" of $100,000 during the
pendency of the instant review, the fact that this subsidiary finding is unsupported by
substantial evidence does not undermine Commerce's overall conclusion such that
remand would be necessary.

1062 (Fed. Cir. 2001) (citing *Matsushita Elec. Indus. Co. Ltd. v. United States,* 750 F.2d 927, 933 (Fed. Cir. 1984)).  Instead, given the temporal overlap between these receipts and payments, the court finds that substantial evidence supports the agency's finding that "Mr. Hume was compensated by his Chinese clients during the entire course of his representation of NMGGC," and at the same time, "Mr. Katz and Mr. Crawford were compensated by Mr. Hume."  I&D Mem. at 21.

> iii.   *Commerce's finding that NMGGC misreported the reasons behind Mr. Crawford's withdrawal of his previous review request concerning Harmoni*

As noted in the factual background section, NMGGC represented to the agency that Mr. Crawford had requested a review of Harmoni in AR 20, but "withdrew his request after private investigators were sent [by Harmoni and the FGPA] to inspect his facility and pry into his business."  NMGGC Suppl. Review Req. Cmts at 4-5. Commerce determined this statement was contradicted by record evidence, which showed that Mr. Hume and Mr. Crawford withdrew the request in AR 20 "at the behest of Mr. Hume's Chinese clients."  I&D Mem. at 21.  Indeed, in sworn declarations to the agency, Mr. Hume stated the reason for the withdrawal as follows:

> Harmoni went after Mr. Bai in China. . . . When I learned (and communicated with [Mr.] Crawford) that Harmoni was jeopardizing [Mr. Bai's] business and [Mr.] Wang [] asked me to consider asking [Mr.] Crawford to withdraw his review request.  [Mr.] Crawford agreed, and we did.

I&D Mem. at 21 & n.126 (quoting NMGGC Refiling of 3/22/16 Submission (Apr. 8, 2016) – Part 2, Ex. 5 (Decl. of Robert T. Hume) (Mar. 22, 2016), PR 115, CJA Vol. II, PJA Vol. II).

NMGGC asserts that events relating to the withdrawal of the review request in

AR 20 are not relevant to the current review because each review is a separate

segment.  NMGGC Br. at 34.  Regardless of the actual reason for the withdrawal of the

review request in AR 20, these inconsistent representations were made to the agency in

AR 21 and support the agency's credibility assessment in this review.

      *iv.*   *Commerce's other findings and credibility determinations*

In addition to the foregoing examples, the agency also noted other contradictions

between Mr. Katz' statements in his February 2017 submission and NMGGC's

questionnaire response upon which Commerce relied to make its initial finding that

NMGGC qualified as a domestic interested party.  *See* I&D Mem. at 21.  Specifically,

the agency explained:

> [R]regarding its status as a domestic producer, [] NMGGC claimed that
> "[g]arlic farmers in the United States cannot compete with the Chinese
> garlic funneled into the United States by Harmoni that is exempt from the
> [agency's] administrative reviews."  However, Mr. Katz later stated that
> "Boxcar Farm's fundamental problem is not competition from cheap garlic
> coming in from China," and that "[b]ased on nearly two years of
> conversation with Crawford and Hume, there was usually never any
> pretense otherwise in verbal conversation."  Referring again to Mr.
> Crawford and Mr. Hume, Mr. Katz stated that "[o]ur stated moral high
> ground – 'leveling the playing field,' etc., etc. – inevitably came with a
> 'wink, wink' whenever we talked about it."

*Id.* at 21 & nn.128-31 (citing NMGGC Questionnaire Resp. at 4; Katz 2/10/17 Letter;

Katz 2/21/17 Letter at 7) (second, fourth, and fifth alterations in original).

The agency further noted "serious problems with the certifications" that NMGGC

submitted pursuant to 19 C.F.R. § 351.303(g).[43]   *Id.* at 22.  Mr. Katz claimed that he

---

[43] Pursuant to 19 C.F.R. § 351.303(g), "person(s) officially responsible for presentation
of factual information" and "the legal counsel or other representative," if applicable, must

had not personally signed company certifications that his counsel submitted to

Commerce on his behalf, and had not provided his approval to counsel to make those

submissions.  *Id.* at 22 & n.136 (citing Katz 2/21/17 Letter at 7) (Mr. Katz stating that he

"only signed one Certification document - at the very beginning").  NMGGC confirmed

that its counsel "adopted a procedure of compliance similar to the use of an autopen."

NMGGC Reply to 3/3/17 Harmoni Submission – Part 1 (Mar. 8, 2017) ("NMGGC 3/8/17

Letter Pt. 1") at 2, PR 461, CJA Vol. IV at ECF p. 461, PJA Vol. IV; *see also* I&D Mem.

at 22.  Commerce acknowledged that while Mr. Hume produced some emails in which

he or his office staff requested permission from Mr. Katz and Mr. Crawford for the

placement of their "e-signature" on documents or approval of drafts prepared, this

evidence did not account for all of the submissions.  I&D Mem. at 22; *see also* NMGGC

3/8/17 Letter Pt. 1, Exs. 3 (sample emails seeking authorization), 4 (sample approvals).

Moreover, "Mr. Crawford attempt[ed] to retroactively approve certain submissions" by

belatedly signing certifications, but Commerce determined that "the contradictions and

inconsistencies present in the statements made by the members of [] NMGGC raise[d]

further concerns regarding the reliability of all of [] NMGGC's submissions."  I&D Mem.

at 23.  Overall, the court finds Commerce's reliance on these additional concerns to be

supported by substantial evidence.

> v.    *Commerce's rescission of its review of Harmoni*

The agency "possesses inherent authority to protect the integrity of its yearly

administrative review decisions."  *Tokyo Kikai Seisakusho, Ltd. v. United States,* 529

---

certify to the accuracy of each document submitted to the agency and indicate the date
the certification.

F.3d 1352, 1361 (Fed. Cir. 2008).  Having concluded that Commerce's individual

findings and credibility determinations with respect to NMGGC are supported by

substantial evidence, the court affirms Commerce's decision that NMGGC's review

request was illegitimate *ab initio.*

### 3. Commerce's decision not to refer NMGCC's claims to the DOJ

As noted previously, NMGCC claims that Commerce abused its discretion in

failing to request that the DOJ investigate and prosecute NMGGC's allegations that

Harmoni and the FGPA "engag[ed] in collusion" and "effectively established a monopoly

in trade for Chinese garlic."  NMGGC Br. at 39.  Commerce concluded that it did not

have the authority to enforce the criminal laws of the United States, and declined to

offer an opinion on NMGGC's allegations.  I&D Mem. at 23.  In challenging that

conclusion before the court, NMGGC simply cites to 18 U.S.C. § 1001 and 18 U.S.C.

§ 371, both of which are criminal statutes.  *See* NMGGC Br. at 39.

Plaintiff has failed to develop this argument in that it does not provide any

authority that would have obligated Commerce to accept NMGGC's suggestion of

referring the matter to the DOJ, let alone any precedent establishing that Commerce

abused any discretion in declining to do so here.  Moreover, NMGGC has not

addressed whether Commerce's refusal to exercise that discretion is judicially

reviewable by this court pursuant to 28 U.S.C. § 1581(c), the jurisdictional basis of

NMGGC's complaint.   *See* Compl. ¶ 12, ECF No. 12.  Based on NMGGC's failure to

develop its argument, the court deems it waived.  *See Home Prods. Int'l., Inc. v. United*

*States,* 36 CIT __, __, 837 F. Supp. 2d 1294, 1301 (2012) (quoting *United States v.*

*Zannino,* 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived.")).

### E. Conclusion

For the reasons set forth above, NMGGC's motion for judgment on the agency

record also is denied.

Judgment will enter accordingly.

/s/    Mark A. Barnett
Mark A. Barnett, Judge

Dated:  November 26, 2018
       New York, New York